**FRIENDS OF the WILD SWAN, INC.,
and Alliance for the Wild Rockies,
Inc., Plaintiffs,**

v.

**UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the United States Department of the Interior, and Michael J. Spear, Director, Region One of the United States Fish and Wildlife Service, Defendants.**

Civil No. 94–1318–JO.

United States District Court,
D. Oregon.

Nov. 13, 1996.

Gary Keith Kahn, Reeves Kahn & Eder, Portland, OR, Jack R. Tuholske, Missoula, MT, for Plaintiffs.

Kristine Olson, United States Attorney, District of Oregon, Thomas C. Lee, Assistant United States Attorney, United States Attorney's Office, Portland, OR, Ellen J. Kohler, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, Scott W. Horngren, Michael E. Haglund, Shay S. Scott, Haglund & Kirtley, Portland, OR, for Defendants and Intervenor-Defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

Plaintiffs Friends of the Wild Swan, Inc. and Alliance for the Wild Rockies, Inc. challenge the United States Fish and Wildlife Service's (FWS's) 1994 FINDING that listing of the bull trout as endangered or threatened under the federal Endangered Species Act (ESA) was warranted but precluded. This case is now before this court on plaintiffs' and defendants' cross motions (112, 124) for summary judgment. For the reasons discussed below, I hereby GRANT plaintiffs' motions and DENY defendants' motions. This case is remanded to FWS for further procedures in accordance with this opinion.

## FACTUAL, LEGAL, and PROCEDURAL BACKGROUND

### A. The Endangered Species Act

In 1973, Congress enacted the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 to 1543, "to provide a program for the conservation of * * * endangered and threatened species." 16 U.S.C. § 1531(b). In order to receive the Act's protections, a species must be "listed" as endangered or threatened by the Secretary of the Interior, who has delegated his duties for terrestrial species to the federal Fish and Wildlife Service (FWS).[1]

In determining whether to list a species, FWS determines whether the species "is a threatened or endangered species because of any of the following factors:"

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). In addition, the Secretary of the Interior, through FWS, must make listing determinations "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation * * * to protect such species * * *." 16 U.S.C. § 1533(b)(1)(A).

Citizens can also petition FWS to list a species. 16 U.S.C. § 1533(b)(3)(A). In general, FWS must make a finding within 90 days of the petition's submission "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* If the action is warranted, FWS com-

---

1. 50 C.F.R. § 17.1. The National Marine Fisheries Service has been delegated ESA listing re- sponsibilities for marine species.

mences "a review of the status of the species concerned," *id.*, and within 12 months must find either that: (1) the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) "[t]he petitioned action is warranted, but"

> (I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action * * * is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

> (II) expeditious progress is being made to add qualified species to either of the lists * * * and to remove from such lists species for which the protections of this chapter are no longer necessary * * *.

16 U.S.C. § 1533(b)(3)(B).

The ESA requires FWS to establish as published agency guidelines "a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section * * *." 16 U.S.C. § 1533(g). In compliance, FWS has published a 12–level ranking system based on three criteria. 48 Fed.Reg. 43098, 43102 (Sept. 21, 1983). First, FWS determines whether the magnitude of the threat to the species is "high," on the one hand, or "medium to low," on the other. *Id.* Second, it determines whether the immediacy of the threat is "imminent" or "non-imminent." Finally, it looks to the taxonomic level of the species at issue—monotypic genus,[2] species, or subspecies. *Id.* A monotypic genus facing a high magnitude and imminent threat receives a rank of "1"; a subspecies facing a moderate-to-low magnitude and non-imminent threat receives a rank of "12." *Id.* In effect, the lower the ranking number, the more important it is for the species to be listed and receive the Act's protections.

FWS's guidelines do not specify factors for FWS to rely upon when it classifies a proposed species into each of the three criteria, nor has FWS delineated general factors besides its ranking scale that it will consider.

Finally, FWS has emphasized that it sets only relative, not absolute, priorities. 48 Fed.Reg. at 43099.

Despite this obscurity and indeterminacy in the ranking process, a species' priority level effectively determines whether or not it is listed under the ESA: in 1994, for example, "[b]ecause of limited staff and funding, the Service must give priority to the listing of species with a listing priority of 1 through 6." WARRANTED, BUT PRECLUDED ADMINISTRATIVE 12–MONTH FINDING ON A PETITION TO LIST THE BULL TROUT UNDER THE ENDANGERED SPECIES ACT 25 (June 6, 1994) (A.R. I.B) (hereinafter 1994 FINDING). Because of the way FWS's ranking system is structured, this policy meant that in 1994 only species facing a "high" magnitude of threat receive the Act's protections. *See* 48 Fed.Reg. at 43102.

FWS can also issue emergency regulations when a situation poses "a significant risk to the well-being of any species of fish or wildlife or plants" if it gives proper notice. 16 U.S.C. § 1533(b)(7). Such emergency regulations remain in effect for 240 days. *Id.*

## B. The Bull Trout

Bull trout (*Salvelinus confluentus*) is a freshwater fish found in the western United States,[3] Canada, and Alaska. The species was recognized in 1978, but two general factors have contributed to a significant reduction in its numbers. First, the steady elimination of its migratory form has threatened the species's continued existence in the continental United States. As FWS has found:

> Extensive migrations are characteristic of this species. *Persistence of migratory life history forms and maintenance or reestablishment of stream migration corridors is crucial to the viability of bull trout populations.* Migratory bull trout facilitate the interchange of genetic material between populations, ensuring sufficient viability within populations. Migratory forms also provide a mechanism for recolonizing local populations extirpated due to natural or human-caused events. Migrato-

---

**2.** A monotypic genus is a genus made up of only one species. 48 Fed.Reg. at 43103. FWS gives a higher priority to such species because they represent "highly distinctive or isolated gene pools * * *." *Id.*

**3.** Bull trout populations currently exist in Montana, Idaho, Oregon, Washington, and Nevada. California populations are extinct.

ry bull trout ·have been restricted and/or eliminated due to stream habitat alterations, including seasonal or permanent obstructions, detrimental changes in water quality, increased temperatures, and the alteration of natural stream flow patterns. 1994 FINDING 2–3 (emphasis added; citations omitted). Moreover,

> Bull trout distribution has been significantly reduced since pre-settlement times. River basins once supported larger, migratory forms and numerous local populations distributed throughout tributary streams. Highly migratory fluvial populations have been eliminated from the largest, most productive river systems across the range. Most river systems now contain only isolated, remnant populations of resident fish restricted to the headwater areas of a few remaining suitable tributaries. These remnant populations have lost their migratory life-history forms, exist in isolation, and are likely to be at extreme risk of extinction.

*Id.* at 3 (citations omitted).

The second ·set of general factors affecting the bull trout is land and water management. As FWS has concluded, "Virtually every bull trout population within the coterminus United States is threatened by a wide variety of land and water management practices." *Id.* at 23. These practices, which degrade the bull trout's habitat, combine with the loss of the migratory form to increase the threat to the species:

> The interrelated effects of habitat degradation, hybridization, isolation, and overutilization have significantly impaired metapopulation function and made it impossible for many populations to recover from natural or manmade perturbations. Even without additional habitat losses, most isolated populations are not likely to persist. Even the few remaining "healthy" bull trout populations are at risk as habitat fragmentation and degradation continues.

*Id.* at 24.

## C. Procedural History of Plaintiffs' Petition to List the Bull Trout

As allowed under the ESA and FWS's regulations,[4] on October 27, 1992, plaintiffs petitioned FWS to list the bull trout as an endangered species. They also requested emergency listings for certain bull trout populations.

On May 17, 1993, over six months after plaintiffs' petitioned FWS, FWS issued a 90–day finding concluding that plaintiffs' petition presented substantial information that listing of the bull trout might be warranted. 58 Fed.Reg. 28,849 (1993). When FWS had not issued its 12–month finding by February 8, 1994, plaintiffs filed suit in federal court to compel that finding. *Alliance for the Wild Rockies v. Babbitt,* No. 94–0246–JLG (D.D.C. 1994). FWS issued the 1994 FINDING on June 6, 1994, and the case was dismissed.

The 1994 FINDING concluded that listing of the bull trout was warranted but precluded. 1994 FINDING 26. FWS found that the bull trout had a priority of 9 under its guidelines. It treated the bull trout as a subspecies because "[d]istinct vertebrate population segments are treated the same as a subspecies in the Service's priority system." 1994 FINDING 26. It considered the threat to the bull trout in the continental United States to be imminent "[b]ecause of current population declines and present threats from continuing, ongoing activities." *Id.* at 25–26. However, "[t]he Service considers that the threat to the bull trout's continued existence is moderate because of its widespread range, the existence of populations in protected areas; and ongoing management changes (e.g. Forest Plan) that are expected to benefit some populations." *Id.* at 25. Because the bull trout did not have a priority between 1 and 6, its listing, although warranted, was precluded by higher-priority species. *Id.* If FWS had determined that the bull trout faced a "high" magnitude of threat, its priority rank would have been a 3, and hence, according to FWS's guidelines and policy, it would have been listed as a protected species.

On November 1, 1994, plaintiffs filed suit in the federal District Court for the District of Oregon to challenge the 1994 FINDING, arguing that the "warranted but precluded"

---

**4.** 50 C.F.R. § 424.14.

finding for the bull trout was arbitrary and capricious. On January 31, 1995, FWS upgraded the bull trout's priority ranking from 9 to 3. 12–MONTH RECYCLED PETITION FINDING FOR A PETITION TO LIST THE BULL TROUT AS THREATENED OR ENDANGERED, 60 Fed.Reg. 30825, 30825 (June 12, 1995) (hereinafter 1995 FINDING). "Plaintiffs moved for summary judgment on March 28, 1995. Defendants filed a motion to dismiss, arguing that the January upgrade rendered the case moot, and in the alternative that the district court should issue a stay until the new finding required by the ESA[5] was filed in June. The District Court granted the stay * * *." *Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*, No. 95–35916, at 3, 1996 WL 155143 (9th Cir. April 2, 1996).

The bull trout was never listed. On June 12, 1995, FWS issued its new 12–month finding for the bull trout. 1995 FINDING, 60 Fed.Reg. at 30825. Despite FWS's upgrade in the bull trout's priority five months earlier, FWS nevertheless again concluded that listing of the bull trout was warranted but precluded. *Id.* It reached this finding by again assigning the bull trout a priority of 9. *Id.* FWS explained its decision as follows:

In January 1995, the Service reevaluated the listing priority for the bull trout in the coterminus United States. At this time, there was uncertainty over the status of pending State and Federal actions, such as PACFISH and a new emphasis on timber harvest proposals in areas damaged by fires and insects. Following this reevaluation, the Service concluded that threats previously considered moderate in several watersheds were now of high magnitude and the majority of the populations were subject to imminent threats of high magnitude. On January 31, 1995, the Service elevated the listing priority for the species from 9 to 3.

\*     \*     \*     \*     \*     \*

Actions taken at both the Federal and State levels are beginning to reverse the long-term decline of bull trout. The Forest Service and Bureau of Land Management, by implementing the President's Forest Management Plan, PACFISH, the Inland Native Fish Strategy and the Eastside Columbia Basin Environmental Impact Statement's recommendations, have initiated activities that will reduce the magnitude of threats to bull trout. In addition, the States of Idaho, Montana, Oregon, and Washington, through their development of bull trout protection agreements, are setting in place activities that will assist the recovery of the bull trout. The Service believes that these activities provide conservation actions and management strategies that will recover and sustain populations of the bull trout.

1995 FINDING, 60 Fed.Reg. at 30825.

On June 22, 1995, this court issued an order declaring plaintiffs' challenge to the 1994 FINDING moot because of the 1995 FINDING and instructing plaintiffs to amend their complaint to challenge the 1995 FINDING, if they so desired. Plaintiffs declined to amend their complaint and appealed to the Ninth Circuit. The Ninth Circuit found that plaintiffs' challenge "falls within the exception to the mootness doctrine for claims that are capable of repetition yet evading review." *Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*, No. 95–35916, at 6, 1996 WL 155143 (9th Cir. April 2, 1996). Accordingly, the Ninth Circuit remanded the case to this court.

The parties have now filed cross motions for summary judgment, which raise two basic issues. First, did FWS fail to address plaintiffs' requests for emergency listings of some populations? Second, was FWS's 1994 finding that listing of the bull trout was warranted but precluded arbitrary and capricious?

## STANDARDS OF REVIEW

Both sides have moved for summary judgment. Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Here, the only challenge presented is a legal

---

5. The ESA requires that, when FWS makes a "warranted but precluded" determination, it must treat the petition as resubmitted, 16 U.S.C. § 1533(b)(3)(C)(i), and hence must again issue a 12–month finding regarding the species' status and priority.

one: Are FWS's decisions in its 1994 FIND-ING to not issue emergency findings and to designate listing of the bull trout as "warranted but precluded" sufficiently reasoned and supported by the record to withstand judicial scrutiny? Therefore, summary judgment is an appropriate vehicle for resolving this dispute.

FWS's actions pursuant to the ESA are reviewed under the federal Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981–82 (9th Cir.1985). Under this standard, the reviewing court must set aside the agency's decision of it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n,* 92 F.3d 940, 942 (9th Cir.1996) (quoting *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn.,* 463 U.S. at 43, 103 S.Ct. at 2866 (citations omitted). Finally, an agency must set forth clearly the grounds on which it acted. *Atchison T. & S.F. Ry. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973).

"Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *O'Keeffe's, Inc.,* 92 F.3d at 942 (citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989)). Nevertheless, the reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)).

## DISCUSSION

### A. Emergency Listings in Specified Watersheds

In their original petition to FWS to list the bull trout, plaintiffs also requested emergency listings for the bull trout in 26 aquatic systems and waterbodies.[6] Like regular listings, emergency listings consist of FWS-promulgated regulations. 16 U.S.C. § 1533(b)(7). However, the emergency listing process differs from the normal listing process in two ways. First, the rulemaking provisions of the federal APA do not apply to emergency listings; instead, FWS must publish an explanation of its reasons for issuing the emergency regulation and must give actual notice of the regulation to the states in which the species occurs. *Id.* Second, emergency listings remain in effect only 240 days "unless, during such 240–day period, the rulemaking procedures which would apply to such regulation [in a normal listing process] are complied with." *Id.*

FWS now argues that because it determined that listing of the bull trout was warranted but precluded, it has sufficiently addressed plaintiffs' request for emergency listings. MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT & IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT 25 [hereinafter DE-

---

**6.** Specifically, plaintiffs requested emergency listings in the following aquatic ecosystems: Flatbed Lake and Flatbed River Basin; Bitterroot River; Blackfoot River; Clark Fork River; Lake Pend Oreille; Priest Lake; Coeur d'Alene River; Kootenai River; Fisher River; and Yaak River. Plaintiffs also requested emergency listings for the following waterbodies: Flint Creek; Middle Fork of the Willamette River; Trailbridge Reservoir; Clear Branch of the Hood River; Boulder and Dixon Creek tributaries to the Klamath River; Coyote Creek tributaries to the Sycan River; Cherry and Sun Creek tributaries to Upper Klamath Lake; Odell Lake; Granite Boulder and Big Creek tributaries to the John Day River; Middle Fork of the Malheur River; Eagle Creek tributary to the Powder River; Wenatchee River basin; Entiat River basin; Yakima River basin; Naches River basin; and Jarbidge River basin.

FENDANTS' MEMORANDUM]. However, Congress amended the ESA in 1988 to impose special emergency listing duties on FWS when that agency makes a "warranted but precluded" determination. Specifically, when FWS makes a finding that listing a species is warranted but precluded, it takes on two additional duties: it "*shall* implement a system to monitor effectively" that species, and it "*shall* make prompt use of the authority under paragraph 7 [emergency regulations] to prevent a significant risk to the well-being of any such species." 16 U.S.C. § 1533(b)(3)(C)(iii) (emphasis added).

Congress's use of "shall" indicates that it imposed a legal duty—not a discretionary power—upon FWS. Moreover, because FWS only makes a "warranted but precluded" finding in response to a petition to list a species, its duty to consider emergency listings is now a part of the petitioning process. Ordinarily, one would expect that information obtained from FWS's monitoring would prompt any emergency listings of "warranted but precluded" species.[7] The Act suggests, moreover, that citizens cannot use the petitioning process *solely* to request that FWS make emergency listings.[8]

Here, however, plaintiffs included a request for emergency listings in their petition to list the bull trout, and FWS admits that it did, in fact, respond to plaintiffs' request in its 1994 FINDING. DEFENDANTS' MEMORANDUM 25. Because plaintiffs presented their request to FWS through the normal petitioning process and because FWS actually acted on that request, this court may review FWS's decision pursuant to the APA.

Only one appellate-level federal court has addressed emergency listings for "warranted but precluded" species. In *City of Las Vegas v. Lujan*, 891 F.2d 927 (D.C.Cir. 1989), the City of Las Vegas challenged an emergency listing of the desert tortoise as being arbitrary and capricious. The court noted that

> with respect to emergency listings, Congress amended the Endangered Species Act in 1988, specifically directing the Secretary to "make prompt use of the authority under [16 U.S.C. § 1533(b)(7)] to prevent a significant risk to the well being of any ... species" that had previously been found to warrant an endangered listing (such as the desert tortoise). See 16 U.S.C. § 1533(b)(C)(iii) (emphasis added). *At least with respect to "warranted but precluded" species, Congress therefore indicated that the Secretary was to use his emergency powers less cautiously—in a sense to "shoot first and ask all of the questions later."*

*Id.* at 932 (emphasis added). Congress's 1988 amendment was "unambiguous congressional direction to the Secretary that emergency listings of warranted but precluded species be issued prophylactically * * *." *Id.* at 933.[9]

In its 1994 FINDING, FWS acknowledged plaintiffs' requests for emergency listings. 1994 FINDING 2. Moreover, the record in this case indicates not only that FWS was aware of the request but that its internal policies dictated that its decisions regarding emergency listings be "clearly presented." MEMORANDUM FROM DEPUTY REGIONAL DI-

---

7. The court notes, however, that the ESA joins the monitoring duty and the duty to use emergency listing authority with an "and," suggesting that they are independent, not sequential, duties. 16 U.S.C. § 1533(b)(3)(C)(iii).

8. Given the posture of this case, this court need not decide this issue. However, the right to petition arises from the APA, 5 U.S.C. § 553(e). *See* 15 U.S.C. § 1533(b)(3)(A). Section 553 of the APA supplies rulemaking procedures. 5 U.S.C. § 553. The ESA's emergency listing provision explicitly provides that 5 U.S.C. § 553 does not apply to it. 16 U.S.C. § 1553(b)(7). However, the Act also provides that 5 U.S.C. § 553 applies "to any regulation promulgated to carry out the purposes of this chapter" and does

not exempt the emergency listing section from that statement. On its face, therefore, the Act contains ambiguities regarding this issue.

9. Given the prophylactic nature of emergency listings for "warranted but precluded" species, the D.C. Circuit concluded that the standard of review for emergency listings *actually issued* was something less than the normal arbitrary and capricious standard. *Id.* at 932. However, for the same reasons, and given Congress's purpose to encourage emergency listings for "warranted but precluded" species, this court holds that the normal "arbitrary and capricious/contrary to law" standard is more appropriate for the agency's decisions *not* to issue emergency regulations.

RECTOR, REGION 6, TO REGIONAL DIRECTOR, REGION 1 [10] (March 18, 1993), at 1 (A.R. IV.D. 49). However, of the 26 aquatic systems and waterbodies for which plaintiffs requested emergency listings, FWS at best discussed or mentioned (sometimes only obliquely) only 18, and then only when discussing the general distribution of the bull trout. 1994 FINDING 4–14. In addition, FWS's comments demonstrate levels of concern for these subpopulations varying from near hopelessness to generalized and moderate concern to explicit recognitions that particular subpopulations are near—but not at—extinction.[11] Nevertheless, FWS made no explicit findings regarding emergency listings for any subpopulation, nor did it explain why it did not make those findings.

It is a "fundamental rule of administrative law" "that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). As a corollary to this rule:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

**10.** Region 1 of the Service has the lead in the listing of the bull trout.

**11.** FWS's comments included:

"Bull trout are essentially extirpated from Priest Lake." 1994 FINDING 8.

"Bull trout have been extirpated from a significant portion of the Columbia River basin * * *, including * * * most of the Yakima River." *Id.*

"Numbers are low and declining in most of the occupied habitat in the east Cascade tributaries to the Columbia River, including the

*Id.* at 196–97, 67 S.Ct. at 1577 (quoting *United States v. Chicago, M., St. P. & P.R. Co.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935)); *see also Atchison, T. & S.F. Ry.*, 412 U.S. at 807, 93 S.Ct. at 2374 (noting that "the agency must set forth clearly the grounds on which it acted").

In its 1994 FINDING, FWS has not given this court any explanation of why it denied all of plaintiffs' requests for emergency listings of the bull trout. For that reason alone, this court must find that decision arbitrary and capricious. *See Northwest Motorcycle Assn. v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1478 (9th Cir.1994) ("The agency's explanation must be sufficient to permit effective judicial review, see *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] * * * (1947), and the reviewing court should not attempt to make up for deficiencies in the agency's decision. *Motor Vehicle Manufacturers*, 463 U.S. at 43 [103 S.Ct. at 2866] * * *."). However, as noted above, the lack of a clear presentation of the agency's decision also runs counter to FWS policy and the advice of the Office of the Regional Solicitor, Department of Interior, A.R. IV.D.49—another reason for finding its decision arbitrary and capricious. Plaintiffs are thus entitled to judgment as a matter of law on this issue.

**B. The Bull Trout's Status as "Warranted but Precluded"**

In its 1994 FINDING, FWS found that listing of the bull trout was warranted but precluded based on its ranking of the bull trout as a 9. 1994 FINDING 26. This ranking, in turn, depends upon FWS's determination that the magnitude of the threat to the bull trout is "moderate," not "high." *Id.* at 25.[12]

Methow, Entiat, and Wenatchee Rivers." *Id.* at 12.

"One remnant population of bull trout remains [in the Washington portion of the Pend Oreille River Basin], and it is at high risk of extinction." *Id.*

**12.** As explained above, under FWS's guidelines, only species evaluated as facing a "high" magnitude of threat are immediately listed. 1994 FINDING 25. Neither of the other two factors would lead to a "warranted but precluded" determination if FWS had determined that the bull trout faced a "high" magnitude of threat. *See id.*

Therefore, this court's review will focus on whether FWS's determination that the bull trout face a "moderate" threat is arbitrary and capricious.

In reviewing FWS's decision, this court "must judge the propriety of such action solely by the grounds invoked by the agency." *S.E.C. v. Chenery Corp.*, 332 U.S. at 196, 67 S.Ct. at 1577; *see also French Hospital Med. Ctr. v. Shalala*, 89 F.3d 1411, 1416 (9th Cir.1996) (noting that under the APA, "an agency's decision may be upheld only on the basis of its reasoning in that decision" and citing *Vista Hill Foundation, Inc. v. Heckler*, 767 F.2d 556, 559 (9th Cir.1985)). FWS explicitly listed the factors that it relied upon in determining that the bull trout faced a "moderate" threat. "The Service considers that the threat to the bull trout's continued existence is moderate because of its widespread range, the existence of populations in protected areas, and ongoing management changes (e.g. Forest Plan) that are expected to benefit some populations."[13] 1994 FINDING 25. This court's review of whether FWS's determination is arbitrary and capricious is thus limited to the propriety of its reliance on these factors.[14]

■ Several aspects of the record make FWS's reliance on these factors, without further explanation, so questionable and internally inconsistent as to render that reliance arbitrary and capricious. The record supports FWS's conclusions that the bull trout has a widespread range and that it exists in protected areas. However, FWS's own findings contradict any assertion that these factors reduce the threat of extinction to the bull trout. As FWS itself noted, "[p]ersistence of migratory life history forms and maintenance or re-establishment of stream migration corridors is *crucial* to the viability of bull trout populations (Rieman and McIntyre 1993)." 1994 FINDING 2. The Service discussed in detail how hydropower dams have isolated many bull trout populations, concluding that "[n]atural recolonization of historically occupied sites has become impossible." *Id.* at 20. Moreover, the threat of hybridization with brook trout "is exacerbated when larger, migratory forms of bull trout have been eliminated and gene flow is prevented by the isolation of remnant bull trout populations." *Id.* at 23. In short, "[o]nce isolated, bull trout populations face relatively high probabilities of extinction due to loss of gene flow and relatively low population size (Rieman and McIntyre 1993)." *Id.*

Thus, in concluding that bull trout are sufficiently threatened with extinction to warrant listing under the ESA, FWS repeatedly emphasized the loss of the migratory life form as an important factor creating that risk of extinction. Therefore, its reliance on the species' widespread range—a range consisting largely and increasingly of isolated subpopulations—as a reason for viewing the threat as "moderate" is internally inconsistent and "entirely fail[s] to consider an important aspect of the problem." *O'Keeffe's, Inc.*, 92 F.3d at 942 (citation omitted). As such, FWS's reliance on this factor, without further explanation, supports a finding that the 1994 FINDING is arbitrary and capricious.

■ The record provides even less support for FWS's reliance on the presence of bull trout populations in protected areas. In its briefing statement for the Regional Director, prepared less than four months before the 1994 FINDING, the Washington State Supervi-

**13.** The court again notes that it could not find, nor did FWS offer, any written or formal policy statement or rule establishing these factors as a routine part of FWS's ranking evaluations. FWS's reliance on these factors is therefore entitled to little deference, especially because FWS did not explain its choice of those factors here and because this court concludes that reliance on these factors contradicts congressional intent in the ESA and/or renders FWS's 1994 FINDING internally inconsistent. *See Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (administrative *"legislative regulations* are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." (emphasis added)).

**14.** The court emphasizes that it makes no determination as to whether the record as a whole, viewed *in toto*, supports the finding of a "moderate" threat, as FWS argues it should. Because FWS limited the basis of its own determination, this review, too, is limited to the factors FWS chose to delineate. *See French Hospital Med. Ctr.*, 89 F.3d at 1416.

sor concluded that "threats exist even in ecosystems not impacted by traditional physical habitat perturbations, such as Wilderness Areas and National Parks, where non-native brook and lake trout pose a serious threat to the persistence of many bull trout populations." BRIEFING STATEMENT/MEMORANDUM FROM STATE SUPERVISOR, ECOLOGICAL SERVICES, WASHINGTON STATE OFFICE TO REGIONAL DIRECTOR, U.S. FWS, REGION 1 (February 22, 1994) (A.R. IV.D.7). A briefing statement written three months later reached a similar conclusion:

> Even in wilderness areas and national parks, the threat of extirpation due to introduced species is great. Extirpated populations are unlikely to be reestablished due to the loss of migratory life history forms. Many isolated populations face serious risks of extinction even with no further habitat loss.

BRIEFING STATEMENT, BULL TROUT ONE-YEAR FINDING (May 25, 1994) (A.R. IV.H.7). FWS cites to nothing in the record, nor could this court find anything in that record, that supports its conclusion that the presence of bull trout in protected areas reduces the magnitude of the threat to the species.[15] Therefore, FWS's reliance on the presence of bull trout in protected areas constitutes "an explanation for its decision that runs counter to the evidence before the agency" and necessitates a finding that the agency's decision is arbitrary and capricious. *See O'Keeffe's, Inc.*, 92 F.3d at 942.

◼ Finally, FWS's reliance on land management plans of other federal agencies with future effect is both arbitrary and capricious and contrary to law, and for four reasons. First, FWS made clear in oral argument that the then-newly-promulgated Clinton Forest Plan was a key factor in its decision that the threat to the bull trout was moderate. The Clinton Forest Plan, however, is *not* part of the administrative record for the 1994 FINDING. Therefore, FWS should not have relied upon it in determining the magnitude of the threat to the bull trout, and this fact alone is

sufficient to render its decision arbitrary and capricious.

Second, FWS more generally relied on "ongoing management changes (e.g. Forest Plan) that *are expected* to benefit some populations." 1994 FINDING 25 (emphasis added). These management changes were for the future, with uncertain effect on the bull trout species. However, as FWS has acknowledged, it is required "to base listing decisions upon an analysis of *existing* threats." BRIEFING STATEMENT/BULL TROUT STATUS REVIEW (February 15, 1994), at 2 (A.R. IV.H.4). Thus, FWS determines for listing decisions whether a species "*is* an endangered species or threatened species," 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c), based on the *current* status of the species. *See* 16 U.S.C. § 1533(b)(1)(A). Moreover, it must make its listing determination "solely on the basis of the best scientific and commercial available" to it. *Id.* It cannot rely upon its own speculations as to the future effects of another agency's management plans to put off listing a species, and such reliance here again requires a finding that the decision was arbitrary and capricious.

Third, reliance on management plans is at odds with the factors FWS must use to determine whether listing of the bull trout is warranted at all. The ESA establishes that "the inadequacy of existing regulatory mechanisms" is one basis for determining that a species is endangered or threatened. 16 U.S.C. § 1533(a)(1)(D). As such, FWS's finding that listing of the bull trout was warranted strongly implies that existing regulatory mechanisms are in fact inadequate to protect the trout. Specifically, in assessing this criterion, FWS found that:

> Federal and State laws designed to conserve fish resources or maintain water quality have not been sufficient to prevent past and ongoing habitat degradation and population fragmentation. Conservation measures provided for in many Federal regulations are merely advisory.

---

**15.** FWS has directed this court's attention to A.R. V.G.2. DEFENDANTS' MEMORANDUM 10. That document, however, consists of unidentified handwritten notes entitled "Map/Spatial Info

Needs—Bull Trout." A.R. V.G.2. It presents no assertion that the presence of bull trout in protected areas reduces the magnitude of the threat to the species.

1994 FINDING 22. This court finds it difficult to understand, without further analysis and explanation by the agency, how FWS can find past and present protective measures so insufficient and yet rely on its future expectations of additional such measures to avoid listing the bull trout.[16]

Finally, FWS's reliance on the plans of other federal agencies is contrary to the provisions and purposes of the ESA. Since 1982, FWS may take "into account those efforts, if any, being made by any *State or foreign nation,* or any political subdivision of a *State or foreign nation,* to protect such species * * *." 16 U.S.C. § 1533(b)(1)(A), *as amended by* Pub.L. 97–304 § 2(b)(1)(A), 96 Stat. 1411 (Oct. 13, 1982) (emphasis added). Similarly, FWS "shall give consideration to species which have been—* * * (ii) identified as in danger of extinction, or likely to become so within the foreseeable future, by any *State agency or by any agency of a foreign nation* that is responsible for the conservation of fish or wildlife or plants." 16 U.S.C. § 1533(b)(1)(B)(ii), *as amended by* Pub.L. 97–304 § 2(b)(1)(B), 96 Stat. 1411–12 (Oct. 13, 1982) (emphasis added). No provisions explicitly authorize FWS to consider the actions of other federal agencies.

Congress thus left out of the listing process consideration of other federal agencies' actions. This omission in the 1982 amendments is particularly obvious when the current Act is compared to the 1973 version, which required that listing determinations be made "after consultation, as appropriate, with the affected States, interested persons and organizations, *other interested Federal agencies,* and, in cooperation with the Secretary of State, with the country or countries in which the species concerned is normally found * * *." Pub.L. 93–205 § 4(b)(1), 87 Stat. 887 (Dec. 28, 1973) (emphasis added).

The omission of other federal agencies furthers the purposes of the Act because the ESA imposes conservation duties on all federal agencies only *after* FWS has taken the initial step of listing the species as endangered or threatened. *See* 16 U.S.C. § 1531(c)(1) (announcing the policy of Congress "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter"); 16 U.S.C. § 1536(a)(1) (requiring federal agencies to carry out programs "for the conservation of endangered and threatened species listed pursuant to section 1533"); 16 U.S.C. § 1536(a)(2) (requiring that federal agencies not jeopardize listed species). As the U.S. Supreme Court has noted:

> [U]nder § 4(1)(a) of the Act, * * * the Secretary of the Interior is vested with *exclusive* authority to determine whether a species * * * is "endangered" or "threatened" and to ascertain the factors which have led to such a precarious existence. By § 4(d) Congress has authorized—indeed commanded—the Secretary to "issue such regulations as he deems necessary and advisable to provide for the conservation of such species."

*Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 171–72, 98 S.Ct. 2279, 2290, 57 L.Ed.2d 117 (1978) (citations omitted; emphasis added). Only after listing do other federal agencies' comprehensive duties to protect endangered and threatened species arise. *See id.* at 180–82, 98 S.Ct. at 2294–96. The Act thus clearly indicates that federal protection of endangered and threatened species *begins* with the listing process, and it would be contrary to the purposes of the Act for FWS to allow the actions of one or two federal agencies, not required by the ESA, to deprive an otherwise warranted species of the broad protections the Act would require of *all* federal agencies if FWS completed the listing process.

---

**16.** This is not to say that the factors for prioritizing species need be identical to the factors for determining whether to list a species in the first place; indeed, the act of prioritizing requires additional analysis. However, it is axiomatic that FWS cannot contradict the ESA in its prioritizing decisions. Moreover, FWS has given this court no indication of how it differentiates its review of "the inadequacy of existing regulatory mechanisms" for purposes of listing a species pursuant to 16 U.S.C. § 1533(a)(1) and its review of regulatory mechanisms for purposes of prioritizing species. In the absence of a clear explanation of the agency's policy and decisionmaking process, its asserted conclusion cannot stand.

FWS has further emphasized this limitation in its own regulations, establishing that when it makes listing determinations, it shall consider the efforts being made by states and foreign nations. 50 C.F.R. § 424.11(f). In contrast, the only provision it has made for other federal agencies is that FWS shall consult "as appropriate" with "other affected Federal agencies" "[w]hen considering any revision of the lists." 50 C.F.R. § 424.13.

"The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978). When it gave FWS the authority to make "warranted but precluded" findings, Congress simultaneously warned courts that they "will, in essence, be called on to separate justifications grounded in the purposes of the Act from the foot-dragging efforts of a delinquent agency." H.REP No. 835, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.C.C.A.N. 2860 (Sept. 17, 1982). Under the APA, FWS's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider." *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 95 F.3d 892, 899 (9th Cir.1996). Similarly, even if FWS's apparently *ad hoc* delineation of factors supporting its determination that the bull trout faced a "moderate" threat were entitled to *Chevron* deference, "this court must reject constructions that are contrary to clear congressional intent or that frustrate the policy Congress sought to implement." *French Hospital Med. Ctr.*, 89 F.3d at 1416 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984)). Because this court finds that (1) FWS relied upon the Clinton Forest Plan, which was never part of the administrative record before it; (2) FWS relied on one factor that Congress did not intend it to consider, contradicting congressional purposes; (3) FWS relied on a second factor that is contradicted by the record with no corresponding support; and (4) FWS relied on a third factor that appears to be inconsistent with its own biological findings, it concludes that FWS's determination that the bull trout faces a "moderate" threat is arbitrary and capricious. As such, plaintiffs are entitled to judgment as a matter of law on this issue.

## C. The 1995 FINDING

In 1995, FWS renewed its "warranted but precluded" determination for the bull trout, again giving the species a ranking of 9. 1995 FINDING, 60 Fed.Reg. at 30825. In doing so, it relied heavily on new U.S. Forest Service and Bureau of Land Management actions to determine that the magnitude of threat was again "moderate" and not "high," predicting that these actions "*will* reduce" the threat to the bull trout. *Id.* (emphasis added). In combination with state bull trout protection agreements, FWS concluded that it "*believes* that these activities provide conservation actions and management strategies that *will recover and sustain* populations of the bull trout." *Id.* (emphasis added). Without these predicted future benefits and the actions of other federal agencies, however, FWS strongly implied that the magnitude of threat to the bull trout would be "high"—as it had found five months earlier, assigning the bull trout, temporarily, a priority of 3. *Id.* Because FWS again relied on factors that are contrary both to the provisions and purposes of the ESA and to its own internal policies, its 1995 FINDING is subject to the same deficiencies as its 1994 FINDING.

In addition, while the Service explicitly looked at specific watersheds in determining the species's status, *id.*, it again made no explicit findings regarding emergency listings. Thus, its implicit emergency listing determination is again insufficient as a matter of law.

## SCOPE OF RELIEF

■ FWS argues that its 1995 FINDING is beyond the scope of this lawsuit and that plaintiffs are entitled only to declaratory relief because the 1995 FINDING supersedes the 1994 FINDING. However, the Ninth Circuit expressly reversed this court's determination that the 1995 FINDING rendered plaintiffs' challenge to the 1994 FINDING moot, concluding that the ESA mandated revisitation of the issue and that the public interest "sup-

ports resolution" of the bull trout's status. *Friends of the Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, No. 95–35916, at.5–6, 1996 WL 155143 (9th Cir. April 2, 1996). In the face of this ruling, it would defy principles of both logic and judicial economy for this court to deny plaintiffs any effective relief; resolution of the legal issue, as the Ninth Circuit ordered, is meaningless if it will not affect FWS's future actions.

Two aspects of the bull trout listing procedure argue against FWS's simplification of the importance of our determination that the 1994 FINDING was arbitrary and capricious. First, if FWS concludes that it should have ranked the bull trout as facing a "high" magnitude of threat, listing of the bull trout should proceed in accordance with the Act; as such, the 1995 FINDING will be without legal effect because the Act never would have required it. *Compare* 16 U.S.C. § 1533(b)(3)(C)(i) *with* 16 U.S.C. § 1533(b)(3)(B)(ii).

Second, even if FWS affirms its "warranted but precluded" finding on legally defensible grounds, it will not be finished with the bull trout. As the Ninth Circuit noted, "FWS is required by the ESA to make a new determination every twelve months if it finds listing the bull trout warranted but precluded." *Id.* (citing 16 U.S.C. §§ 1533(b)(3)(B) and 1533(b)(3)(C)(i)). Under this requirement, FWS should have again revisited the bull trout's status by June 1996, twelve months after its 1995 FINDING. To the best of this court's knowledge, FWS has not published the required 12–month finding for 1996. FWS's reconsideration of its 1994 FINDING in light of this opinion will, this court hopes, inform any future decisions FWS must make regarding listing of the bull trout, including emergency listing decisions.

■ FWS also cites lack of funding as a reason not to remand the bull trout findings to it. DEFENDANTS' MEMORANDUM 26–27. Funding considerations do not repeal or modify FWS's duties under the ESA. *Environmental Defense Ctr. v. Babbitt*, 73 F.3d 867, 871 (9th Cir.1995). Nevertheless, lack

of funds, when Congress expressly prohibits expenditures for listing species, can excusably delay mandatory listing determinations. *Id.* at 872. FWS does not argue that it is current *prohibited* from expending funds— only that it does not think that the bull trout will fit into its current funding priorities. Under FWS's current guidelines, however, emergency listings receive the highest priority. DEFENDANTS' MEMORANDUM 27; 61 Fed. Reg. 24722, 24725 (May 16, 1996).[17] Reconsideration of its earlier determinations could well mean that FWS will find that certain listing actions for the bull trout should be higher in FWS's current funding priorities. Viewing FWS's current situation as a whole in light of our determination that FWS's decisions regarding the bull trout—including its emergency listing decisions—are arbitrary and capricious, this court cannot conclude that a remand to the agency is irrational, as FWS argues.

Therefore, this court concludes that FWS's failure to address emergency listings of the bull trout and its determination that the magnitude of the threat facing that species is "moderate" rather than "high" have been arbitrary and capricious/contrary to law. It remands the 1994 FINDING to the agency for further consideration in accordance with this opinion, with the additional instructions that (1) FWS must limit its review to the record before it in 1994, and (2) if FWS concludes that it should have issued emergency listings and/or should have determined that the bull trout faced a "high" magnitude of threat in its 1994 FINDING, it will incorporate those new determinations into its current listing priorities. If FWS's reconsideration does not alter its ultimate conclusion that listing of the bull trout is "warranted but precluded," this court respectfully reminds the agency of its duties pursuant to 16 U.S.C. § 1533(b)(3)(C)(i) and (b)(3)(C)(iii) to treat plaintiffs' petition as resubmitted and to use its authority to issue emergency listings "to prevent a significant risk to the well-being of any such species."

17. The court also notes that, by their own terms, these priorities expired on September 30, 1996.

61 Fed.Reg. at 24722.

Accordingly, plaintiffs' motion (112) for summary judgment is GRANTED; defendants' motion (124) for summary judgment is DENIED. The 1994 FINDING is reversed and remanded to FWS for reconsideration in accordance with this opinion within the next four months.

IT IS SO ORDERED.